723 A.2d 35

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. MARIO I. DONIS, DEFENDANT–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
HEIDI M. GORDON, DEFENDANT–APPELLANT.

Argued April 27, 1998—Decided December 10, 1998.

*Eric R. Neisser,* argued the cause for appellants (*Roger C. Martindell, William A. Slover* and *Eric R. Neisser,* attorneys).

*Charles M. Ouslander*, Assistant Prosecutor, argued the cause for respondent (*Daniel G. Giaquinto*, Mercer County Prosecutor, attorney).

*Debra A. Owens*, Deputy Attorney General, argued the cause for *amicus curiae*, Attorney General of New Jersey (*Peter Verniero*, Attorney General, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

The issue in these appeals is the constitutionality of a law enforcement officer's random check of a motor vehicle's license plate number using a mobile data terminal.

## I.

### A.

As background, a mobile data terminal (MDT) consists of a screen and keypad that are linked to the computerized databases of the New Jersey Division of Motor Vehicles (DMV). The information that may be accessed by a user of the MDT is restricted. Because the MDT is an inquiry-only device and has no computing power of its own, a police officer is unable to add, change, or delete any information displayed on the pre-formatted screen. Information may be retrieved through the MDT by entering a license plate number.

When an officer enters a vehicle's license plate number, the initial "DMV plate" screen shows the expiration date of the registration for that vehicle; the status of the vehicle, including whether it has been reported stolen; the registrant's name, address, date of birth, and driver's license number; the year, make, model, license plate number, and color of the vehicle; the vehicle identification number; the number of owners of the registered vehicle; the maximum number of passengers for a passenger vehicle; the gross weight for a commercial vehicle; and the length of the registered vehicle if it is a boat.

When an officer accesses a DMV plate screen, the MDT then automatically runs a search of the registrant's name and displays the results on the "DMV name" screen. The DMV name screen shows the registrant's name and the number of names that match that search name; the registrant's driver's license number and date of birth; a code for the registrant's eye color; a code for whether the license or registration is suspended; whether the license is a photo or non-photo license; the licensee's address, social security number, date of birth, weight, and height; the term of the license; the license expiration date; the number of points accrued against the license; and the number of endorsements and restrictions on the license.

An officer with a driver's license number also can access the "DMV DL" screen. That screen shows the license expiration date; the driver's license number; the number of points accrued against the license; a code for whether the license or registration is suspended; the licensee's name, address, date of birth, sex, eye color code, height, weight code, and social security number; whether the license is a photo or a non-photo license; the term of the license; the number of endorsements and restrictions on the license; whether the endorsements and restrictions are for a vehicle or a boat; and the vehicle class code. As is apparent, much of the information retrieved from the "DMV DL" screen is included in the previously accessed screens.

In addition to using the license plate number, an officer can also enter the vehicle identification number to determine whether state or federal records indicate that the car has been reported stolen. By entering the licensee's name, an officer can further learn whether that individual is wanted by state or federal authorities. Currently, however, MDTs do not have access to the criminal history record information of the National Crime Information Center (NCIC) or the State Crime Information Center (SCIC). Furthermore, at no time does the MDT provide any reference to the registrant's race.

Prior to the installation of MDT terminals in patrol cars, law enforcement officers had access to the same information as is available from the MDT. Access to that information, however, was provided by the dispatcher over police-band radio rather than in-vehicle terminals.

In both of these cases, police officers randomly entered the license plate numbers of petitioners' cars and accessed their DMV records, discovering that their driving privileges had been suspended. Use of the MDT by each officer was not governed by any manuals or policy directives and there was no supervision or recordkeeping involved. Petitioners challenge the officers' suspicionless access of that information as violative of Article I, paragraph 7 of the New Jersey Constitution.

### B.

The essential facts in both cases are undisputed. At approximately 9:28 p.m. on January 24, 1994, Sergeant Kenneth Hawthorne, a West Windsor police officer, was on routine patrol in a marked police car equipped with a MDT. Sergeant Hawthorne was driving northbound on U.S. Route 1 behind a 1986 Subaru, driven by petitioner, Mauro Donis. While traveling behind Donis, the officer entered the vehicle's license plate number. Although Sergeant Hawthorne observed no criminal activity and no driving or equipment violation by Donis, he testified that he punched in the car's license plate number because of his proximity to the vehicle and the opportunity to stop the car if information appeared that would warrant such a stop. In fact, the MDT search revealed that the Subaru belonged to Donis and that his driver's license had been suspended. The MDT also provided Donis's address, birth date, social security number, sex, eye color, weight, and height.

While awaiting the MDT results, Sergeant Hawthorne observed that the driver of the Subaru was a male. He also noticed that the driver due to his low position in the driver's seat was relatively short in stature. The MDT search provided the information that

the car's owner was male and 5'8" in height. Based on his observations of the driver and the results of the MDT inquiry, Hawthorne stopped the car. Donis identified himself to the officer and stated that he owned the car. He also admitted that the car was not insured. Sergeant Hawthorne then issued two summonses: one for driving with a suspended license, contrary to *N.J.S.A.* 39:3–40, and one for driving without liability insurance, contrary to *N.J.S.A.* 39:6B–2.

Donis pleaded guilty to both charges, conditioned on the outcome of his motion to suppress the data that Hawthorne retrieved from the MDT. The municipal court sentenced Donis, but stayed the sentence pending the outcome of the suppression hearing. The motion was denied and Donis appealed. The Law Division conducted a *de novo* hearing and affirmed the denial of Donis's suppression motion. The court found that, as a matter of law, there is no expectation of privacy with respect to a license plate and, thus, an officer may look up a license plate "for no reason at all." Again, Donis appealed. The Appellate Division granted the State's motion for a temporary remand to establish an evidentiary record and retained jurisdiction. When the case returned to the Appellate Division, the court consolidated Donis's appeal with that of Heidi Gordon.[1]

## C.

At approximately 10:00 p.m. on December 6, 1994, Hopewell Township Police Officer Joseph Giordano was parked on the side of Route 654, entering the license plate numbers of passing cars into the MDT in his patrol car. On that day, Giordano estimated that he had checked "two hundred or more" plate numbers. Petitioner, Heidi Gordon, passed in front of Officer Giordano's patrol car and stopped at a traffic light. The MDT revealed that

---

[1] The Appellate Division also consolidated the Donis and Gordon appeals with that of Nathan Levine. However, because Levine did not petition this Court for certification, that case is not addressed.

the owner of the car was a female named Heidi Gordon, a forty-eight year old woman whose driver's license had been suspended. Because his headlights were shining into Gordon's car, Officer Giordano testified that he could determine that the driver and sole occupant of the car was an "older female." Based on his observations and the MDT results, Officer Giordano stopped the car. Confirming Gordon's identity once she provided him with her license, registration, and insurance card, Officer Giordano ticketed her for driving with a suspended license, contrary to *N.J.S.A.* 39:3–40, and for driving without liability insurance, contrary to *N.J.S.A.* 39:6B–2.

Gordon moved to suppress the data obtained by Officer Giordano with the MDT. The municipal court denied Gordon's motion, holding that the intrusion by the officer satisfied the "reasonableness standard" for searches and seizures. Like Donis, Gordon entered a guilty plea to the charges, conditioned on her appeal of the denial of her suppression motion. After sentencing Gordon, the court stayed the license suspension pending the appeal. Eleven months after affirming the denial of Donis's motion to suppress, the Law Division conducted a *de novo* hearing and affirmed the denial of Gordon's suppression motion. The court reiterated that there is no expectation of privacy in one's license plate. Moreover, the court held, the MDT data, in combination with the officer's observations of Gordon, created a reasonable, articulable suspicion that justified the subsequent stop. Gordon appealed.

### D.

After hearing oral arguments in both appeals, the Appellate Division consolidated the two cases and, in a *per curiam* opinion, affirmed the denials of both motions. The panel held that " 'because vehicle license plates are openly displayed and the records [accessed by the MDT] are public,' " (quoting *State v. Parks*, 288 *N.J.Super.* 407, 410, 672 *A.2d* 742 (App.Div.1996)), there was no unconstitutional intrusion on defendants' privacy. The panel further ruled that the stops were valid and did not constitute

unreasonable seizures because the officers reasonably believed there was a "general match" between the appearance of the drivers and the MDT's descriptions of Donis and Gordon. *See Parks, supra,* 288 *N.J.Super.* at 412, 672 *A.*2d 742.

We granted certification, 152 *N.J.* 11, 702 *A.*2d 350, and now affirm.

## II.

■ Petitioners and the State disagree on whether the police officers' random use of the MDT to access their DMV registration and license records violates Article I, paragraph 7 of the New Jersey Constitution. The petitioners assert that random use of the MDT violates the State Constitution. Underlying Article I, paragraph 7 "is the premise that there is a zone of privacy wherein all individuals expect that what they say or do will be protected from unreasonable government intrusion." *State v. Myrick,* 282 *N.J.Super.* 285, 291–92, 659 *A.*2d 976 (Law Div.1995). The State alleges that the New Jersey Constitution "requires only that an expectation of privacy be reasonable," *State v. Hempele,* 120 *N.J.* 182, 200, 576 *A.*2d 793 (1990), and that petitioners had no reasonable expectation of privacy in their license plates and the registration and license information accessed by the MDT.

## A.

■ Like the United States Supreme Court in *Delaware v. Prouse,* 440 *U.S.* 648, 658, 99 *S.Ct.* 1391, 1398, 59 *L.Ed.*2d 660, 670 (1979), New Jersey courts have recognized that "[t]he State has a vital and compelling interest in maintaining highway safety by ensuring that only qualified drivers operate motor vehicles and that motor vehicles are in a safe condition." *State v. Kadelak,* 280 *N.J.Super.* 349, 360, 655 *A.*2d 461 (App.Div.), *certif. denied,* 141 *N.J.* 98, 660 *A.*2d 1197 (1995). Because of the State's extensive regulation of its highways and thoroughfares, "[e]very operator of a motor vehicle must expect that the State, in enforcing its regulations, will intrude to some extent upon that operator's

privacy." *New York v. Class,* 475 *U.S.* 106, 113, 106 *S.Ct.* 960, 965, 89 *L.Ed.*2d 81, 90 (1986).

To maintain highway safety, the State Legislature has authorized the Director of the Division of Motor Vehicles to "[c]ollect such data with respect to the proper restrictions to be placed upon motor vehicles and their use upon the public roads, turnpikes and thoroughfares as shall seem for the public good." *N.J.S.A.* 39:2–3(c). Such requested information includes the name, address, and social security number of a motorist. The purpose of collecting the registration information "is to assist law enforcement officers in locating the owners of stolen cars and to provide [law enforcement officers] with more complete motorist information." Assembly Committee, *Governor's Reconsideration and Recommendation Statement for Assembly Bill Nos. 1845 and 2448* (1989), *reprinted in N.J.S.A.* 39:3–4.

## B.

In New Jersey, the Right to Know Law, *N.J.S.A.* 47:1A–1 to—4, provides citizens of this State with the right to inspect public records, which include any record "required by law to be made, maintained or kept on file by any board, body, agency, department, commission or official of the State." *N.J.S.A.* 47:1A–2. Furthermore, *N.J.A.C.* 13:18–11.3(a) provides that "all records which are required by law to be made, maintained, or kept on file by the Division of Motor Vehicles shall be considered public records." Although the computerized database of the DMV is *not* a public record itself, *N.J.A.C.* 13:18–11.3(c), its contents are contained within the public records maintained by the DMV. The status of DMV records as public records was noted by the Appellate Division in *Parks, supra,* 288 *N.J.Super.* at 410, 672 *A.*2d 742.

Prior to August 1997, citizens of New Jersey had the unqualified right to access the DMV's public records, provided that the citizen "demonstrate[d] to the satisfaction of the Director of the [DMV] ... that he or she ha[d] a legitimate beneficial interest in the

requested record." *N.J.A.C.* 13:18–11.3(d). In 1997, however, the New Jersey Legislature enacted *N.J.S.A.* 39:2–3.3 (Section 3.3) and *N.J.S.A.* 39:2–3.4 (Section 3.4) to protect "the safety of citizens of this state" and to protect "victims of sexual assault or domestic violence [who now] are assured that they have greater protection from those who would harm or have harmed them." *Governor Whitman's Press Release*, dated August 5, 1997.

The enactment of Sections 3.3 and 3.4 places New Jersey in compliance with the federal Driver's Privacy Protection Act, 19 *U.S.C.* ¶ 2721–2725, which prohibits states from disclosing personal information contained in motor vehicle records except under certain, specified circumstances. Congress passed that Act in response to the murder of a young actress by an obsessed fan who had hired a private investigator to gather personal information, including her address, from the California Division of Motor Vehicles. Additional examples illustrating the potential for invasive and dangerous use of motor vehicle records were set forth in the Congressional records. See 139 *Cong. Rec.* § 15,745–01 (1993) (statement of Senator Boxer):

> In Iowa, a gang of teenagers copied down the license plate numbers of expensive cars, obtained the home addresses of the owners from the Department of Transportation, and then robbed them at night.
>
> In Tempe, Arizona, a woman was murdered by a man who had obtained her home address from that State's DMV.
>
> And, in California, a 31–year–old man copied down the license plate numbers of five women in their early twenties, obtained their home address from the DMV and then sent them threatening letters at home.

Recognizing the legitimate concern of motorists that identifying information, such as their home address and social security number, not be released indiscriminately to the general public, the Legislature passed Section 3.4, which prohibits the disclosure of "personal information about any individual obtained by the [DMV] in connection with a motor vehicle record." *N.J.S.A.* 39:2–3.4. Section 3.3, in turn, defines "personal information" to include "information that identifies an individual, including an individual's photograph; social security number; driver identification number; name; address other than the five-digit zip code; telephone

number; and medical or disability information." *N.J.S.A.* 39:2–3.3. Personal information, however, does not include information related to vehicular accidents, driving violations, or a driver's status. *Ibid.*

Despite that restriction on the public's access to DMV records, the Legislature provided an exception for the disclosure of such personal information for law enforcement purposes. *N.J.S.A.* 39:2–3.4(c)(1) provides that the personal information listed above "shall be disclosed for use in connection with matters of motor vehicle or driver safety and theft" and may be disclosed "[f]or use by any government agency, including any court or law enforcement agency in carrying out its functions."

## C.

█ Petitioners assert that the police should not be permitted to process an inquiry through the MDT until they observe a driver commit an apparent motor vehicle violation. We disagree. The use of MDTs by police officers should not be limited only to those instances when they actually witness a violation of motor vehicle laws. By the time an officer observes a vehicle improperly change lanes or speed down the highway, that officer no longer needs to use the MDT. The officer has a permissible basis to effectuate a stop.

The United States Supreme Court has recognized that "it is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of [an] automobile.... The exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a 'search.'" *New York v. Class,* 475 *U.S.* 106, 114, 106 *S.Ct.* 960, 966, 89 *L.Ed.*2d 81, 90 (1986); *see also Katz v. United States,* 389 *U.S.* 347, 351, 88 *S.Ct.* 507, 511, 19 *L.Ed.*2d 576, 582 (1967) (stating that Fourth Amendment does not protect what "a person knowingly exposes to the public"). Although the *Class* Court considered the expectation of privacy in a vehicle identification number, the same analysis logically applies to a vehicle's

license plate, which is displayed on the exterior of the car in plain view.

Moreover, the Legislature has required the display of a license plate on both the front and rear of all cars registered in New Jersey. *N.J.S.A.* 39:3–33. The very purpose of that law is to identify the owner of a car should the need arise from his or her license plate. To fulfill that purpose, police officers randomly using MDTs should have the right to determine from a motorist's license plate the status of the vehicle and the driving status of the registered owner, i.e., whether the car is registered, stolen, and whether the registered owner is licensed. It does not appear, however, that the Legislature contemplated that Sections 3.3 and 3.4 would permit the random use of MDTs to secure "the personal information" of motorists by police officers who had no reason to suspect wrongdoing.

### III

In enacting Sections 3.3 and 3.4, the Legislature balanced the State's goals to maintain highway safety by ensuring that only qualified drivers operate safe motor vehicles, by protecting law enforcement officers in fulfilling their duties and by protecting motorists from unnecessary disclosure of their personal information. To best balance those concerns, the data displays of the MDTs should be reprogrammed to provide for a two-step process. In the first step, the initial random license plate look-up would display information regarding only the registration status of the vehicle, the license status of the registered owner, and whether the vehicle has been reported stolen. The registered owner's personal information would not be displayed. If the original inquiry disclosed a basis for further police action, then the police officer would proceed to the second step, which would allow access to the "personal information" of the registered owner, including name, address, social security number, and if available, criminal record.

With the reprogrammed MDTs, police officers who were using MDTs at random and who lacked suspicion could access only non-private information. Nonetheless, if the initial MDT inquiry disclosed that the car was unregistered, reported stolen or that registered owner was not properly licensed, that information would then justify the police officer accessing the "personal information" from the MDT. The ability of law enforcement officers under step-two to access full information identifying motorists will help protect those officers from danger as they stop and approach motor vehicles.

### A.

The concurrence asserts that the Legislature intended to prohibit the random use of MDTs because such use does not constitute the "carrying out [of law enforcement] functions." *Infra*, at 63, 723 A.2d at 44. Such a finding would render MDTs useless as efficient investigative tools. That was not the Legislature's intent in enacting Sections 3.3 and 3.4. A spot check of a license and registration status contributes to public safety. Removing unlicensed drivers and unregistered and stolen vehicles from the road promotes public safety. Under the two-step process, the information most useful to patrol officers, such as the motorist's license and registration status, would be available to advance legitimate, enforcement-based interests. An officer who sees a license plate in plain view will be able to compare it to a computerized list of plates belonging to cars that are unregistered, reported stolen, or driven by an unlicensed driver.

For example, if the reprogrammed MDT revealed that a passing car was unregistered, the officer could stop the car on the reasonable suspicion that its driver was operating an unregistered vehicle in violation of *N.J.S.A.* 39:3-4. If the reprogrammed MDT revealed that a passing car was reported stolen, the officer would have a sufficient basis to stop the car in the belief either that the driver committed the theft or that the investigative stop would generate evidence relating to the theft. If the reprogrammed

MDT informed the officer that the car's owner had an expired or revoked license, the officer would have adequate grounds to stop that vehicle as well.

### B.

We acknowledge that the two-step process would not preclude an officer from using the original inquiry screen to obtain "personal information," that the proper use of MDTs and the information accessed therefrom depends on the officer's discretion, and that officers could obtain such personal information from other sources. However, we assume that the law enforcement community will use the MDTs properly and will comply with the restrictions imposed by the Court.

In this appeal, there are no claims that the police targeted or stopped petitioners' cars based on impermissible motives. Nevertheless, petitioners continue to assert that under the two-step process, police use of MDTs will continue to pose the risk that law enforcement officers will abuse their discretion and access MDT databases for personal or impermissible reasons. We emphasize that it is the specific officer, not the use of the MDT, that poses the danger of improper targeting. In the future, if MDTs are abused, such misuse by any officer should be addressed and punished swiftly. The Attorney General should promulgate guidelines that establish disciplinary measures that will be imposed on any law enforcement officer for improperly using the MDT. The promulgation of those guidelines should substantially lessen any concerns about potential abuses that may arise from the random use of the MDT. We observe that police departments are not prohibited from imposing more restrictions on the random use of MDTs by their police officers than are imposed in this opinion.

We also understand that the advances of technology may have outdistanced the privacy concerns that we now address. Nonetheless, we believe that the two-step process best achieves the Legislature's goals in enacting Sections 3.3 and 3.4.

## C.

█ Finally, we observe that in both of these appeals, petitioners' convictions were based on license plate identification, and that additional evidence linked each petitioner to the offense. The police officers in their initial use of MDT learned that the vehicles' owners had suspended licenses. That information itself gave rise to the reasonable suspicion that the vehicle was driven in violation of the motor vehicle laws and was in itself sufficient to justify a stop. However, in addition to that information, the officers also had determined through a "match-up" that the drivers were the registered owners. On the descriptive information provided by the MDT and the "general match" of petitioners, the officers therefore had reasonable suspicion to believe that the drivers were violating the law. *See Village of Lake in the Hills v. Lloyd,* 227 *Ill.App.*3d 351, 169 *Ill.Dec.* 351, 591 *N.E.*2d 524, 526 (Ill.App. 2 Dist.1992) ("Police knowledge that an owner of a vehicle has a revoked driver's license provides a reasonable suspicion to stop the owner's vehicle for the purpose of ascertaining the status of the license of the driver. Common sense dictates that such information, standing alone, is sufficient to provide a constitutional basis for stopping a vehicle or its occupants."), *appeal denied,* 146 *Ill.*2d 630, 176 *Ill.Dec.* 801, 602 *N.E.*2d 455 (Ill.1992); *People v. Ceballos,* 175 *A.D.*2d 315, 572 *N.Y.S.*2d 84, 85 (1991) (finding computer check of license plate number indicating that registered owner's driving privileges had been suspended provided permissible basis to stop defendant's vehicle).

## D.

Based on information set forth in the Attorney General's letter of August 14, 1998 to the Court, we recognize that time will be required to modify the MDTs used by the numerous law enforcement agencies throughout the State to implement the two-step process ordered by this opinion. Such reprogramming, however, should be completed by June 1, 1999. Until that installation process is complete, however, law enforcement agencies through-

out the State should be permitted to randomly use MDTs for valid law enforcement reasons. Because of the Legislature's stated concern for the nondisclosure of a motorist's personal information, the Attorney General should caution law enforcement agencies against the indiscriminate use of MDTs during that interim period.

The judgment of the Appellate Division is affirmed.

STEIN, J., concurring.

Confronted with a challenge to the constitutionality of random use of mobile data terminals (MDTs) by police officers, the Court concludes—correctly, in my view—that the controlling statutes do not "permit the random use of MDTs to secure '. . . personal information' of motorists by police officers who had no reason to suspect wrongdoing." *Ante* at 55, 723 *A.*2d at 40. To implement that conclusion, the Court orders the reprogramming of MDTs in order to provide a police officer with information about the current status of a vehicle owner's registration and driver's license without making available to that officer any personal information about the vehicle owner. *Ante* at 56–57, 723 *A.*2d at 40–41. Regrettably, the Court undermines its own conclusion and dilutes the usefulness and clarity of its opinion when it permits police officers, pending completion of the MDT programming, to continue to use MDTs to make random, suspicionless look-ups of motorists' personal information, in direct contravention of the Court's interpretation of the controlling statutes. Although I am in substantial agreement with the Court's disposition of this appeal, I write separately to express my disagreement with the Court's unwillingness to hold unconditionally that random use of MDTs by police officers to obtain motorists' personal information is impermissible conduct that violates *N.J.S.A.* 39:2–3.4(c).

I

The Court's grant of certification in these consolidated appeals required it to consider only the question whether random police

entry of motor vehicle license plate numbers into MDTs to gain access to the computerized databases of the New Jersey Division of Motor Vehicles (DMV) violates Article I, Paragraph 7 of the New Jersey Constitution. Although the Court's opinion acknowledges and addresses that issue, *ante* at 51–52, 54–56, 723 *A.*2d at 38–39, 40–41, it stops short of deciding it, electing instead to treat the legality of police officers' random use of MDTs primarily as an issue of statutory interpretation. *Ante* at 56–58, 723 *A.*2d at 40–42. That approach is consistent with this Court's traditional policy of avoiding constitutional adjudications whenever legal issues presented can be resolved on non-constitutional grounds. *See O'Keefe v. Passaic Valley Water Comm'n,* 132 *N.J.* 234, 240–42, 624 *A.*2d 578 (1993).

The Court's opinion describes the statutory context underlying its disposition. *Ante* at 52–55, 723 *A.*2d at 39–40. The Legislature has authorized the Director of DMV to "[c]ollect such data with respect to the proper restrictions to be placed upon motor vehicles and their use upon the public roads, turnpikes and thoroughfares as shall seem for the public good." *N.J.S.A.* 39:2–3(c). Prior to 1997, except as otherwise provided by law all records required to be maintained by DMV constituted public records subject to the Right to Know Law, *N.J.S.A.* 47:1A–1 to –4. See *N.J.A.C.* 13:18–11.3(a). In 1997, however, the New Jersey Legislature enacted legislation that sharply restricted access to personal information about motorists that had been compiled and accumulated by the DMV. *L.* 1997, *c.* 188. Codified at *N.J.S.A.* 39:2–3.3 and –3.4, the amendatory legislation was designed to comply with the federal Driver's Privacy Protection Act, 18 *U.S.C.* §§ 2721–2725, which imposed significant restrictions on the authority of state motor vehicle departments to disseminate or disclose personal information concerning motorists, 18 *U.S.C.* § 2721, and authorized criminal fines on individuals and civil penalties of up to $5000 per day on any state department of motor vehicles whose practices were in substantial noncompliance with the Act. 18 *U.S.C.* § 2723. As the Court's opinion relates, the federal act was passed by Congress in response to numerous

incidents throughout the country involving violence, threats of violence and other criminal acts against victims whose home addresses had been obtained by inappropriate use of state motor vehicle records. *Ante* at 53, 723 *A.*2d at 39.

Directly responding to the concerns underlying the federal legislation, the Legislature enacted *N.J.S.A.* 39:2–3.3 and –3.4. Section 3.3 defines "personal information" as follows:

> "Personal information" means information that identifies an individual, including an individual's photograph; social security number; driver identification number; name; address other than the five-digit zip code; telephone number; and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status.

Section 3.4 prohibits, subject to other qualifying subsections, the DMV or its employees from disclosing "personal information" about any individual obtained by the division in connection with a motor vehicle record. *N.J.S.A.* 39:2–3.4(a). The statute requires disclosure of personal information in connection with "matters of motor vehicle or driver safety and theft," *N.J.S.A.* 39:2–3.4(c), and permits disclosure of personal information "[f]or use by any government agency, including any court or law enforcement agency in carrying out its functions, or any private person or entity acting on behalf of a federal, State or local agency in carrying out its functions." *N.J.S.A.* 39:2–3.4(c)(1). That authorization of disclosure of personal information to government or law enforcement agencies tracks verbatim an identical authorization in the federal statute. 18 *U.S.C.* § 2721(b)(1). The question of statutory interpretation raised by these appeals is whether completely random, suspicionless use of MDTs by police officers to obtain both personal and non-personal information constitutes "use by [a] . . . law enforcement agency in carrying out its functions."

## II

The record in these appeals demonstrates unequivocally that no reasonable suspicion or other specific facts precipitated the police officers' MDT inquiries concerning these petitioners. Donis, a Latino, and Gordon, an African–American, were driving lawfully

and properly in front of (Donis) or past (Gordon) a police officer on routine patrol in a police car. Neither officer observed any driving or equipment violations. Both officers entered the license plate numbers of the cars into their MDTs.

The arresting officer in *Donis* testified that he entered Donis's license plate number in his MDT for "no articulable reason" other than "he just happened to be behind" Donis's car. He testified that he was not following any departmental instructions or law enforcement guidelines and that he typically conducts "random" MDT searches of cars in front of him if he is "not doing anything else." The police officer in *Gordon,* who was parked at the side of the road, testified that, as he did that day, he was in the "habit" of conducting 200 or more random computer searches while on patrol. As the Court's opinion explains, the MDT searches of Donis and Gordon disclosed to the respective police officers personal and non-personal information as defined in *N.J.S.A.* 39:2–3.3.

Without explanation, the Court concludes that in enacting *N.J.S.A.* 39:2–3.3 and –3.4 the Legislature did not contemplate that those sections "would permit the random use of MDTs to secure '. . . personal information' of motorists by police officers who had no reason to suspect wrongdoing." *Ante* at 55, 723 *A.2d* at 40. Except for the testimony of the arresting officers, no evidence in the record illuminates our understanding concerning customary police department usage of MDTs. The briefs inform us that the State's motion to the Appellate Division in *Donis* for a remand to establish an adequate evidentiary record was granted. We also are informed that on remand *Donis* unsuccessfully moved to compel discovery concerning the West Windsor Police Department's use of MDTs during the prior year, and that Donis's proffer of two female fact witnesses who would have testified about their experiences with two New Jersey municipal police officers who used MDTs to acquire personal information about them in pursuit of unwanted romantic interests was rejected by the trial court.

In my view, however, the statutory standard that limits police department use of MDTs to obtain personal information only to uses constituting the "carrying out [of law enforcement] functions" is a sufficient indication of legislative intent to demonstrate that random and suspicionless use of MDTs is not authorized. That interpretation of the statute is consistent with federal and state decisional law concerning the standards governing a police officer's authority to make an investigatory stop. Our cases hold that "an investigatory stop is valid only if the officer has a 'particularized suspicion' based upon an objective observation that the person stopped has been or is about to engage in criminal wrongdoing." *State v. Davis,* 104 *N.J.* 490, 504, 517 *A.2d* 859 (1986). *Accord State v. Citarella,* 154 *N.J.* 272, 278–80, 712 *A.2d* 1096 (1998); *State v. Arthur,* 149 *N.J.* 1, 7–10, 691 *A.2d* 808 (1997); *see also United States v. Brignoni–Ponce,* 422 *U.S.* 873, 884, 95 *S.Ct.* 2574, 2582, 45 *L.Ed.2d* 607, 618 (1975)(holding that "officers . . . may stop vehicles only if they are aware of specific articulable facts, together with the rational inferences from those facts, that reasonably warrant suspicion that the vehicles" were involved in criminal activity); *State v. Dickey,* 152 *N.J.* 468, 475, 706 *A.2d* 180 (1998)(noting that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred")(quoting *Whren v. United States,* 517 *U.S.* 806, 810, 116 *S.Ct.* 1769, 1772, 135 *L.Ed.2d* 89, 95–96 (1996)); *State v. Kirk,* 202 *N.J.Super.* 28, 55, 493 *A.2d* 1271 (App.Div.1985) (invalidating roadblock, stop, and seizure of defendant, and holding that State must justify roadblock procedures and demonstrate substantial public benefit from road-block stops as well as appropriate control of discretion of officers operating roadblock).

Concededly, a suspicionless stop of a motor vehicle to obtain information from its occupants is an imperfect analogy to the suspicionless use of an MDT to obtain "personal information" concerning the vehicle and its owner. But the principle that prohibits investigative stops of motor vehicles absent suspicion of unlawful activity is consistent with an interpretation of the DMV statute recognizing that random and suspicionless use of MDTs to

obtain personal information about the owners of lawfully operated motor vehicles is unauthorized. In each instance, the underlying rationale is the protection of law-abiding citizens from unreasonable police intrusions. That a motorist is unaware of a police officer's random entry of his vehicle's license plate number into an MDT to obtain personal information does not lessen the intrusiveness of the officer's conduct.

Because the intrusion occasioned by the use of MDTs is less invasive than that resulting from a suspicionless seizure of a motor vehicle, I would find acceptable a standard less restrictive than reasonable suspicion of criminal activity to justify police use of MDTs. An obvious example might be a report of an unfamiliar vehicle parked in a residential neighborhood for several days, an occurrence that readily would justify resort to an MDT to obtain information about the vehicle and its owner. I would consider any police use of MDTs that reasonably was related to an appropriate law enforcement purpose to be consistent with the controlling statutory standard, adopted by both Congress and our Legislature, that permits disclosure of motor vehicle agency personal information to a "law enforcement agency in carrying out its functions." 18 *U.S.C.* § 2721(b)(1); *N.J.S.A.* 39:2-3.4(c)(1). Random and suspicionless use of MDTs, however, constitutes not only an unproductive application of police resources but one that reflects only a marginal likelihood of advancing law enforcement objectives. Accordingly, I conclude, as does the Court, that a police officer who unilaterally makes random, suspicionless use of an MDT to obtain personal information about a motor vehicle's owner is acting beyond his authority and is not "carrying out [the] functions of a law enforcement agency" within the meaning of those statutes.

That conclusion compels me to disagree with the Court when, contradicting its own legal determination, it authorizes "law enforcement agencies throughout the State ... to randomly use MDTs for valid law enforcement reasons," pending completion of the MDT reprogramming ordered by the Court. *Ante* at 58, 723

*A.*2d at 42. Obviously, use of MDTs for "valid law enforcement reasons" is authorized by statute and does not require additional authorization by the Court. If the Court is implying that all random uses of MDTs are for "valid law enforcement reasons," its earlier conclusion that the Legislature did not authorize random use of MDTs to obtain personal information, *ante* at 56, 723 *A.*2d at 40, is undermined. The Court would better serve the public interest, and the interests of law enforcement, to hold unequivocally that random and suspicionless use of MDTs by police officers to obtain "personal information" is unauthorized.

One final observation: I would sustain these convictions despite my view that the police officers' random use of their MDTs was impermissible. As the Court's opinion explains, when the MDT gains access to the "DMV name" screen, that screen displays a code indicating whether the license or registration is suspended. That information does not constitute "personal information" under the statute, see *N.J.S.A.* 39:2–3.3, and it was the information that both petitioners' driver's licenses were suspended that led the officers to stop both vehicles. In short, although "personal information" also was revealed on the MDT screens, that personal information did not give rise to the investigatory stops that resulted in the issuances of the summonses at issue in these appeals.

Justice STEIN concurs in result.

*For affirmance*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, COLEMAN and STEIN—7.

*Opposed*—None.