**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3994-14T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

LAWRENCE CARTER, JR.,

    Defendant-Appellant.

_____

          Submitted April 25, 2017 — Decided August 11, 2017

          Before Judges Koblitz and Rothstadt.

          On appeal from Superior Court of New Jersey,
          Law Division, Camden County, Indictment No.
          13-10-3174.

          Joseph E. Krakora, Public Defender, attorney
          for appellant (Margaret McLane, Assistant
          Deputy Public Defender, of counsel and on the
          brief).

          Mary Eva Colalillo, Camden County Prosecutor,
          attorney for respondent (Maura G. Murphy,
          Assistant Prosecutor, of counsel and on the
          brief).

PER CURIAM

A police officer stopped defendant Lawrence Carter, Jr. for careless driving and failing to maintain a light on his vehicle's license plate. When he failed to produce his vehicle registration, another officer searched the vehicle's glove compartment for defendant's registration card and discovered a handgun. A subsequent search of the vehicle pursuant to a warrant revealed additional weapons. Defendant was convicted by a jury of committing all of the multiple weapons offenses charged in an indictment.[1] The court sentenced him to an aggregate thirteen-year term, with a nine-year period of parole ineligibility.

Defendant appeals from his judgment of conviction, challenging the denial of his suppression motion, the rejection of his claim of discriminatory jury selection, and his sentence. He specifically argues:

> POINT I — BECAUSE THE OFFICER HAD NO JUSTIFICATION TO CONDUCT A WARRANTLESS SEARCH FOR THE CAR'S REGISTRATION AND INSURANCE

---

[1] The jury convicted defendant of two counts of second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); two counts of second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); two counts of second-degree certain persons not to possess weapons, N.J.S.A. 2C:39-7(b); one count of third-degree possession of weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); one count of fourth-degree possession of a defaced firearm, N.J.S.A. 2C:39-3(d), one count of fourth-degree possession of weapon (hollow nose or dum-dum bullets), N.J.S.A. 2C:39-3(f); and, one count of fourth-degree unlawful possession of a weapon (stun gun), 2C:39-5(d).

INFORMATION, THE GUNS FOUND IN THE CAR MUST BE SUPPRESSED.

POINT II — THE COURT FAILED TO CONDUCT THE THIRD STEP OF THE GILMORE[2] ANALYSIS, REQUIRING REVERSAL OF DEFENDANT'S CONVICTIONS.

POINT III — THE COURT IMPROPERLY IMPOSED CONSECUTIVE SENTENCES ON THE GUN POSSESSION AND CERTAIN PERSONS CONVICTIONS, RENDERING DEFENDANT'S 13-YEAR WITH A NINE-YEAR PAROLE DISQUALIFIER MANIFESTLY EXCESSIVE.

We have considered defendant's arguments in light of our review of the record and the applicable legal principles. We affirm.

I.

We begin our review by considering defendant's challenge to the denial of his suppression motion. The two police officers who arrested defendant and his co-defendant were the only witnesses to testify at the suppression hearing. The facts derived from their testimony are summarized as follows.

On June 1, 2011, Voorhees Police Officer Thomas Macauley observed defendant's car stop at an intersection with the left turn signal engaged. When the light at the intersection turned green, defendant began to turn left, then abruptly turned right.

---

[2]  State v. Gilmore, 103 N.J. 508 (1986).

Macauley followed defendant and observed that defendant's vehicle did not have a light on its license plate. After continuing to follow defendant for a short time, Macauley activated his vehicle's overhead lights and conducted a traffic stop based upon defendant's careless driving and the broken light on his license plate.

After defendant pulled over, the officer ran the vehicle's license plate and discovered the car was registered to defendant and not reported stolen. When he approached the vehicle, Macauley observed defendant in the driver's seat, codefendant in the front passenger seat, and a woman in the back seat.

While defendant remained seated in his car, Macauley asked him for his license, registration, and insurance. Defendant initially stated he did not have a license, but eventually produced a New Jersey driver's license after being asked multiple times. Although provided with the opportunity to do so, defendant never produced a registration or other proof of ownership or insurance.

The officer asked defendant to exit the vehicle. When he inquired what defendant was doing in the area, defendant initially stated he was coming from Camden and heading towards an out of town location, but eventually told Macauley "he did not know why he was in the area." The officer made various observations about defendant's demeanor that led him to believe defendant may attempt to flee and that he was a threat to the officer's safety. Macauley

4                                                                A-3994-14T3

conducted a pat down of defendant but did not discover a weapon. He also became concerned about the conduct of defendant's codefendant and the woman inside the car. They gave inconsistent explanations as to why they were in the area. He saw codefendant reaching around the floor of the front seat, not keeping his hands in plain sight. After the officer removed codefendant, the woman tried to climb into the front seat and appeared to be very nervous. Macauley conducted a pat down of codefendant that also did not yield any weapons.

During Macauley's encounter with defendant and his passengers, Officer Anthony Del Palazzo arrived on the scene. Macauley returned to his vehicle to search for outstanding warrants and discovered that both men had criminal records and that codefendant had outstanding warrants for his arrest. Macauley arrested and searched codefendant and discovered latex gloves and a bandana.

Macauley asked Del Palazzo to search defendant's vehicle for a registration card or other proof of ownership since none had been provided. Del Palazzo searched the center console and then the glove compartment, where he discovered a loaded handgun. Macauley immediately placed defendant and the woman under arrest. He issued summonses to defendant for careless driving, N.J.S.A. 39:4-97, and failing to maintain required lamps, N.J.S.A. 39:3-

The police later obtained a warrant to search the rest of the vehicle and that search revealed additional weapons and other contraband.[3]

After considering the officers' testimony, the exhibits admitted into evidence, and counsels' arguments, the court denied defendant's motion, but later reconsidered the reasoning for the denial after defendant filed a motion for reconsideration. The court set forth its reasons for reconsideration and again denied defendant's motion on the record on August 7, 2012, in a comprehensive oral decision.

Initially, the court summarized the witnesses' testimony and found the officers' testimony to be credible. The court explained why it found that Macauley properly stopped defendant for the motor vehicle violations he observed and its conclusion that the officer was justified in "ordering defendants out of the vehicle and subsequently patting them down for weapons."

The court next addressed whether the warrantless search of the glove compartment violated defendant's Fourth Amendment

---

[3]   A subsequent search of the entire vehicle pursuant to a search warrant resulted in the police also discovering a revolver with a defaced serial number, loaded with three hollow point bullets, a stun gun, ammunition stashed within a latex glove, two rolls of duct tape, multiple pairs of gloves, and two ski masks. Defendant does not challenge the authorized search on appeal.

rights. The court cited State v. Holmgren, 282 N.J. Super. 212 (App. Div. 1995), which it described as holding that "[f]ailure to produce the vehicle's registration raises a reasonable suspicion that the vehicle is stolen[; under such circumstances an] . . . officer may lawfully conduct a limited warrantless search of areas in the vehicle where such papers may normally be kept by an owner." The court found, "based upon the fact that the ownership of the vehicle had not been established by the defendants . . . . [T]he officer was entitled to look into areas in the vehicle in which evidence of ownership might be expected to be found and that would include the glove compartment as well as the center console." Additionally, relying on State v. Bruzzese, 94 N.J. 210, 236 (1983), cert. denied, 465 U.S. 1030, 104 S. Ct. 1295, 79 L. Ed. 2d 695 (1984), the court concluded the State established the plain view exception applied, justifying the seizure of the weapon.

Our review of the denial of a suppression motion is limited. See State v. Handy, 206 N.J. 39, 44 (2011). We review a motion judge's factual findings in a suppression hearing with great deference. State v. Gonzales, 227 N.J. 77, 101 (2016). We "must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Gamble, 218 N.J. 412, 424

7

(2014); see also State v. Scriven, 226 N.J. 20, 32-33 (2016). We defer "to those findings of the trial judge which are substantially influenced by [the] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). We owe no deference, however, to the trial court's legal conclusions or interpretation of the legal consequences that flow from established facts. Our review in that regard is de novo. State v. Watts, 223 N.J. 503, 516 (2015); State v. Vargas, 213 N.J. 301, 327 (2013).

Applying this standard of review, we conclude that defendant's arguments relating to the denial of his suppression motion are without merit. We affirm substantially for the reasons expressed by the trial court in its comprehensive oral decision. We add the following comments.

Defendant contends that because Macauley was able to determine ownership of the vehicle by running the plates, there was no justification for the officer to search the vehicle's glove compartment. We disagree.

"[A] police officer may make 'ordinary inquiries incident to [a traffic] stop . . . such as 'checking the driver's license,' verifying whether the driver has any outstanding warrants, 'and inspecting the automobile's registration and proof of insurance.'"

State v. Dunbar, ____ N.J. ____,____ (2017) (slip op. at 22-23) (quoting Rodriquez v. United States, ____ U.S. ____,____, 135 S. Ct. 1609, 1615, 191 L. Ed. 2d 492, 499 (2015)). The inquiry allows an officer to confirm, among other things, a driver's compliance with N.J.S.A. 39:3-29, which requires the operator of a vehicle to have these documents in his possession and to produce them when requested by a police officer performing his duties. See State v. Perlstein, 206 N.J. Super. 246, 253 (App. Div. 1985).

During the traffic stop, "after the driver has been provided the opportunity to produce his credentials and is either unable or unwilling to do so," State v. Hamlett, 449 N.J. Super. 159, 173 (App. Div.) (quoting State v. Keaton, 222 N.J. 438, 450 (2015)), certif. granted, ____ N.J. ____ (2017), a limited warrantless search of a glove compartment for vehicle ownership documents may be conducted by a police officer. Id. at 175 (quoting Gonzales, supra, 227 N.J. at 101). Our Supreme Court has repeatedly recognized with approval this type of limited search for documents. See State v. Pena-Flores, 198 N.J. 6, 28 (2009), overruled on other grounds, State v. Witt, 223 N.J. 409, 423-25, 427, 450 (2015) (addressing the requirements for application of the "automobile exception" to the warrant requirement as discussed in Pena-Flores). Under this "driving documents" exception, "[i]f the vehicle's operator is unable to produce proof of registration, the

officer may search the car for evidence of ownership." Keaton, supra, 222 N.J. at 448 (citing State v. Boykins, 50 N.J. 73, 77 (1967)); accord Pena-Flores, supra, 198 N.J. at 31; State v. Patino, 83 N.J. 1, 12 (1980); State v. Gammons, 113 N.J. Super. 434, 437 (App. Div.), aff'd o.b., 59 N.J. 451 (1971), as long as the driver first has an opportunity to produce them voluntarily. See Hamlett, supra, 449 N.J. Super. at 170-74.

Contrary to defendant's argument, and consistent with a driver's obligations under N.J.S.A. 39:3-29, the Supreme Court has approved the application of this exception to the warrant requirement even though police officers had the ability to use an on-board mobile data terminal (MDT) to check on a vehicle's registration and ownership.[4] See e.g. Keaton, supra, 222 N.J. at 448-49. The availability of that information to a police officer does not alter the driver's obligation "to be in the possession of [the required documents] at all times[, which are] to be exhibited upon request to a police officer so that he may

---

[4] A MDT "consists of a screen and keypad that are linked to the computerized databases of the New Jersey Division of Motor Vehicles (DMV)" and allows an officer to obtain information about a vehicle's registered owner from his police car. State v. Donis, 157 N.J. 44, 46 (1998). Before the use of MDT's, a police officer obtained the same information over a radio from a police dispatcher. Id. at 48. Under those circumstances the Court also approved the application of the exception. See Pena-Flores, supra, 198 N.J. at 15-16.

determine, among other things, the 'correctness of the registration certificate, as it relates to the registration number and number plates of the motor vehicle for which it was issued.'" Gammons, supra, 113 N.J. Super. at 437 (quoting N.J.S.A. 39:3-29).

Here, defendant was offered the opportunity to voluntarily present his registration and other ownership documents while still in his vehicle and refused to do so, just as he initially refused to present his license. The fact that the police officer had used a MDT or called in the plates and received a verbal confirmation of ownership did not relieve defendant from his obligation to turn over those documents. When he refused to do so, or if he was unable to do so, the officer was permitted to conduct the limited search of the glove compartment. Hamlett, supra, 449 N.J. Super. at 174. Once he discovered the handgun, it was "properly seized under the plain view exception to the search warrant requirement . . . [, which] allows seizures without a warrant so long as an officer is 'lawfully . . . in the area where he observed and seized the incriminating item or contraband, and it [is] immediately apparent that the seized item is evidence of a crime." Ibid. Defendant's motion to suppress was correctly denied.

## II.

We turn next to defendant's contention regarding the trial court's response to his claim that the prosecutor impermissibly

exercised his preemptory challenges based on race. During jury selection defendant challenged the prosecutor's use of peremptory challenges against four African American jurors. The court conducted an inquiry and determined that defendant established a prima facie claim, as "there ha[d] been a disproportionate number of challenges" to African Americans. The prosecutor then explained the reasons for his challenges as to each of the identified potential jurors. He cited to one juror's disclosure "that she had a police friend, captain, who had a bad experience with other colleagues" and to another who was a minister, who the prosecutor believed would have "difficult[y] . . . judg[ing] someone else on guilt." The prosecutor explained that he challenged another potential juror who he understood enjoyed "playing [video] games that involved guns."[5] Finally, the prosecutor explained he challenged the last of the subject jurors, who was an African American architect, but the reasons for the use of that challenge were unclear from the record and marked inaudible on the transcript.[6] Defendant took issue with the prosecutor's explanations.

---

[5] Defendant and the trial court pointed out the juror did not mention video games involving guns, simply video games.

[6] Although the record does not disclose an express statement of the prosecutor's reasons for challenging the architect, the record

The trial court found "a prima facie case . . . was made[;]" however, it was "satisfied that the State has presented neutral reasons for exercising the disputed challenges."  Accordingly, it concluded "there [wa]s no issue for [the court] to address."

Defendant argues on appeal that the trial court made its determination "[w]ithout analyzing [his] arguments or the prosecutor's race-neutral reasons" and that "[t]he court's failure to conduct the required third step of the Gilmore analysis . . . requires reversal of defendant's convictions."  We disagree.

The burden is on a defendant to prove purposeful discrimination based on the totality of the relevant facts.  Gilmore, supra, 103 N.J. at 534; Batson v. Kentucky, 476 U.S. 79, 93-94, 106 S. Ct. 1712, 1721, 90 L. Ed. 2d 69, 85-86 (1986).  "The opponent of the strike bears the burden of persuasion regarding racial motivation, and a trial court finding regarding the credibility of an attorney's explanation of the ground for a peremptory challenge is entitled to great deference."  State v. Thompson, 224 N.J. 324, 344 (2016) (quoting Davis v. Ayala, ____ U.S. ____,____, 135 S. Ct. 2187, 2199, 192 L. Ed. 2d 323, 335 (2015)) (adopting federal standard of appellate review).  We will

_____

discloses the veniremember was undecided as to the issue of gun control and expressed a view that the justice system may be biased against certain ethnic groups.

not disturb "a trial court's ruling on the issue of discriminatory intent . . . unless it is clearly erroneous." Ibid. (quoting Snyder v. Louisiana, 552 U.S. 472, 477, 128 S. Ct. 1203, 1207-08, 170 L. Ed. 2d 175, 181 (2008)). "A trial court's findings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" Id. at 345 (quoting Elders, supra, 192 N.J. at 243). "An appellate court should not disturb the trial court's findings merely because 'it might have reached a different conclusion were it the trial tribunal' or because 'the trial court decided all evidence or inference conflicts in favor of one side' in a close case." Ibid. (quoting Elders, supra, 192 N.J. at 243).

"This standard, we note, necessarily applies to the trial court's assessment of the prosecutor's candor and sincerity in the presentation of reasons for exercising peremptory challenges." Ibid. We "extend substantial deference to a trial court's determination . . . [because] only the trial judge is in a position to make 'first-hand observations' of the demeanor of both the attorney who exercises the peremptory challenge and the juror who is excused." State v. Osorio, 402 N.J. Super. 93, 105 (App. Div. 2008) (quoting Snyder, supra, 552 U.S. at 477, 128 S. Ct. at 1208, 170 L. Ed. 2d at 181), aff'd. 199 N.J. 486 (2009).

14                                                          A-3994-14T3

A prosecutor may not deprive a defendant of the right to trial by an impartial jury by excluding jurors based on race. See Thompson, supra, 224 N.J. at 340. When a prosecutor's selection of jurors is discriminatory, not only is a particular defendant harmed, but "the very integrity of the courts is jeopardized." Miller-El v. Dretke, 545 U.S. 231, 237-38, 125 S. Ct. 2317, 2323-24, 162 L. Ed. 2d 196, 212 (2005).

A claim of bias in jury selection is evaluated using a three-step process:

> Step one requires that, as a threshold matter, the party contesting the exercise of a peremptory challenge must make a prima facie showing that the peremptory challenge was exercised on the basis of race or ethnicity. That burden is slight, as the challenger need only tender sufficient proofs to raise an inference of discrimination. If that burden is met, step two is triggered, and the burden then shifts to the party exercising the peremptory challenge to prove a race- or ethnicity-neutral basis supporting the peremptory challenge. In gauging whether the party exercising the peremptory challenge has acted constitutionally, the trial court must ascertain whether that party has presented a reasoned, neutral basis for the challenge or if the explanations tendered are pretext. Once that analysis is completed, the third step is triggered, requiring that the trial court weigh the proofs adduced in step one against those presented in step two and determine whether, by a preponderance of the evidence, the party contesting the exercise of a peremptory challenge has proven that the contested peremptory challenge was exercised

on unconstitutionally impermissible grounds of presumed group bias.

[Osorio, supra, 199 N.J. at 492-93.]

See also Thompson, supra, 224 N.J. at 341-44.

The trial court here conducted the required analysis. It found defendant established a prima facie case, noting that four of the State's peremptory challenges were used to exclude African American jurors (step one), the prosecutor provided a reasoned, neutral basis for excluding the African American jurors (step two), basing his challenges on the veniremembers' responses to questions that raised legitimate concerns for the prosecutor, see Osorio, supra, 199 N.J. at 505 (stating that peremptory strikes may be justified if reasonably relevant to case being tried), and the judge considered the arguments of both sides and found no constitutional violation (step three). While the trial court failed to explicitly label its consideration of the parties' arguments as "step three" of its analysis, its application of that step can be inferred from its comments. See State v. Locurto, 157 N.J. 463, 472 (1999).

We discern no reason to disagree with the trial court's determination in this case.[7] "[T]he prosecutor's race-neutral

_____

[7] On appeal, relying upon State v. Fuller, 182 N.J. 174, 201-02 (2004) (stating no juror may be disqualified from jury service

reasons for striking the jurors were found by the court to be credible and were supported by the record." Thompson, supra, 224 N.J. at 350.

## III.

Finally, we address defendant's argument concerning his sentence. According to defendant, the court erred by imposing consecutive sentences for his weapons possession offenses and his certain person offenses. He contends that the court failed to set forth a complete analysis of the Yarbough factors and made factual errors in its findings. We find no merit to these contentions.

On April 25, 2014, the court sentenced defendant, placing its reasons on the record in a thorough and comprehensive oral decision. Addressing its reasons for imposing consecutive sentences, the court stated:

> First of all, as noted by Yarbough,[8] there can be no free crimes in a system for which the punishment shall fit the crime . . . and

based exclusively on his or her religious beliefs or the lack thereof), defendant raises an argument for the first time that the minister was improperly challenged based only on his religious beliefs. We find no merit to this argument as its premise is belied by the record of the juror's responses to questions about his occupation — he stated he was an "ordained minister," "work[ed] in the church," was "a police chaplain," and that his church had "marched in Philadelphia" — as compared to any specific religious beliefs.

---

[8]  State v. Yarbough, 100 N.J. 627 (1985), cert. denied, 475 U.S. 1014, 106 S. Ct. 1193, 89 L. Ed. 2d 308 (1986).

their objectives were not prominently -- predominantly independent of each other, with the exception of the charge of certain persons not to possess weapons.

With respect to whether the crimes were committed at different times or separate places, the [c]ourt note[s] that the prior conviction for which this charge, certain persons, was based, occurred at separate times and places from the current crimes. Also, with respect to the fact of his gun related offenses. Although those offenses did not involve separate acts of violence or threats of violence, or multiple victims, a sentencing court may impose consecutive sentences even though a majority of the Yarbough factors support [a] concurrent sentence.

And I just wanted to put those on the record for my reasons for making [c]ount [n]ine consecutive to all counts except [c]ount [t]en. And [c]ount [t]en will be served concurrent to [c]ount [n]ine in that, for the reasons that I've stated as well as the fact that it is based on similar or same crimes which qualify the defendant for certain persons.

Our review of sentencing determinations is limited and governed by the "clear abuse of discretion" standard. State v. Roth, 95 N.J. 334, 363-65 (1984); see also State v. Bolvito, 217 N.J. 221, 228 (2014). In our review, we will "not substitute [our] judgment for the judgment of the sentencing court[,]" State v. Lawless, 214 N.J. 594, 606 (2013), nor will we disturb a sentence that is not manifestly excessive or unduly punitive, does not constitute an abuse of discretion, and does not shock the

judicial conscience. State v. O'Donnell, 117 N.J. 210, 215-16, 220 (1989). We are "bound to affirm a sentence, even if [we] would have arrived at a different result, as long as the trial court properly identifies and balances aggravating and mitigating factors that are supported by competent credible evidence in the record." Id. at 215. We may only disturb a sentence if: "(1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors . . . were not based upon competent and credible evidence in the record; or (3) 'the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.'" State v. Fuentes, 217 N.J. 57, 70 (2014) (quoting Roth, supra, 95 N.J. at 364-65).

Applying these standards, we discern no abuse of the court's discretion in sentencing defendant to consecutive sentences, essentially for the reasons expressed by the trial court. We add only the following comments.

N.J.S.A. 2C:44-5(a) provides that "multiple sentences shall run concurrently or consecutively as the court determines at the time of sentence." Although there are no statutorily set rules for imposing consecutive sentences, the Court in Yarbough set forth a number of guidelines concerning same.[9] A sentencing court

---

[9]  The factors that must be considered are as follows:

(1) there can be no free crimes in a system for which the punishment shall fit the crime;

(2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;

(3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:

> (a) the crimes and their objectives were predominantly independent of each other;

> (b) the crimes involved separate acts of violence or threats of violence;

> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

> (d) any of the crimes involved multiple victims;

> (e) the convictions for which the sentences are to be imposed are numerous;

(4) there should be no double counting of aggravating factors;

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense; [and]

(6) there should be an overall outer limit on the cumulation of consecutive sentences for

20

(continued)

applies these factors qualitatively, not quantitatively.  State v. Carey, 168 N.J. 413, 427 (2001).  Thus, a court may impose consecutive sentences "even though a majority of the Yarbough factors support concurrent sentences."  Id. at 427-28; see e.g., State v. Molina, 168 N.J. 436, 442 (2001) (finding consecutive sentences were warranted despite the presence of only one Yarbough factor).  Concurrent sentences are not mandated even where the crimes are connected by a "unity of specific purpose, . . . were somewhat interdependent of one another, and were committed within a short period of time of one another."  State v. Swint, 328 N.J. Super. 236, 264 (App. Div.), certif. denied, 165 N.J. 492 (2000).

Once it considers the Yarbough factors, the court is obligated to expressly state the reasons for imposing consecutive sentences or risk remand for resentencing.  State v. Miller, 108 N.J. 112, 122 (1987).  "[T]he reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision."  State v. Miller, 205 N.J. 109, 129 (2011) (quoting Yarbough, supra, 100 N.J. at 643.)

---

> multiple offenses not to exceed the sum of the longest terms (including an extended term, if eligible) that could be imposed for the two most serious offenses.
>
> [Yarbough, supra, 100 N.J. at 643-44 (footnote omitted).]

21

Here, the judge cogently applied the <u>Yarbough</u> criteria in assessing the appropriateness of imposing consecutive sentences. The certain persons not to have weapons offense was clearly a distinct offense from the other weapons charges, and it had distinct elements. Imposing a concurrent sentence on defendant for this offense would have given him a "free crime" and would have frustrated the legislature's intent to deter persons with criminal histories from possessing weapons. Moreover, the aggregate sentence does not shock the judicial conscience. <u>See</u> <u>Roth</u>, <u>supra</u>, 95 <u>N.J.</u> at 365.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3994-14T3