**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3400-18

POLICE OFFICER
MATTHEW LEVINE,

      Plaintiff-Appellant,

v.

TOWNSHIP OF PEQUANNOCK
and TOWNSHIP OF
PEQUANNOCK POLICE
DEPARTMENT,

      Defendants-Respondents.

_____

Argued December 14, 2020 – Decided July 2, 2021

Before Judges Hoffman and Suter.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-0988-18.

Ashley V. Whitney argued the cause for appellant (Law Offices of Gina Mendola Longarzo, LLC, attorneys; Ashley V. Whitney, on the briefs).

Stephen E. Trimboli argued the cause for respondents (Trimboli & Prusinowski, LLC, attorneys; Stephen E.

Trimboli, of counsel and on the brief; John P. Harrington, on the brief).

PER CURIAM

Following an administrative determination of misconduct in this police disciplinary action, plaintiff Matthew Levine filed this action against defendants, Township of Pequannock (the Township) and Township of Pequannock Police Department (the Department), seeking reinstatement to his position as a police officer with the Department, back pay, and counsel fees. The Township sought plaintiff's termination after a Department investigation revealed substantial evidence that plaintiff misused the computer system in his police car to conduct unjustified searches of the motor vehicle records of thousands of New Jersey drivers.

Following a disciplinary hearing, a neutral hearing officer found that plaintiff engaged in "a pattern of official misconduct" and concluded that this misconduct was "sufficiently egregious . . . to warrant his dismissal." The Township adopted this recommendation and terminated plaintiff's employment.

Plaintiff then petitioned for review of his termination in the Law Division, pursuant to N.J.S.A. 40A:14-150. Following a de novo review of the record before the hearing officer, the trial court affirmed the disciplinary conviction and entered a judgment on February 25, 2019, denying plaintiff's application for

reinstatement, dismissing his complaint, and affirming the administrative decision. This appeal followed. Because the trial court's decision was supported by substantial credible evidence, we affirm.

I.

We begin with a review of the relevant controlling authority. Because the Township is a non-civil service jurisdiction, the statutory framework for disciplinary proceedings against police officers is governed by N.J.S.A. 40A:14-147 to -151. Ruroede v. Borough of Hasbrouck Heights, 214 N.J. 338 (2013). That statutory scheme requires the Township to demonstrate "just cause" for any suspension, termination, fine, or reduction in rank. Id. at 354 (citing N.J.S.A. 40A:14-147). Pursuant to N.J.S.A. 40A:14-147, just cause includes "misconduct."

Our Supreme Court has recognized "misconduct" under N.J.S.A. 40A:14-147 "need not be predicated on the violation of any particular department rule or regulation," but may be based merely upon the "implicit standard of good behavior which devolves upon one who stands in the public eye as the upholder of that which is morally and legally correct." In re Phillips, 117 N.J. 567, 576 (1990) (citation omitted). Because "honesty, integrity, and truthfulness [are] essential traits for a law enforcement officer[,]" the Court has upheld

A-3400-18

termination where, for example, an officer made conflicting statements to internal affairs investigators about an off-duty altercation. Ruroede, 214 N.J. at 362-63; see also State v. Gismondi, 353 N.J. Super. 178, 185 (App. Div. 2002) ("[T]he qualifications required to hold [a law enforcement] position require a high level of honesty, integrity, sensitivity, and fairness in dealing with members of the public . . . .").

Pursuant to N.J.S.A. 40A:14-150, an officer is entitled to a hearing, and if convicted of any charge, he may seek review in the Superior Court. Ruroede, 214 N.J. at 355. As noted, the trial court's review is de novo. Ibid. The trial court must provide "an independent, neutral, and unbiased" review of the disciplinary action, and make its own findings of fact. Id. at 357 (citing Phillips, 117 N.J. at 578, 580 (1990)). The court must "make reasonable conclusions based on a thorough review of the record." Ibid. (quoting Phillips, 117 N.J. at 580). "Although a court conducting a de novo review must give due deference to the conclusions drawn by the original tribunal regarding credibility, those initial findings are not controlling." Ibid. (quoting Phillips, 117 N.J. at 579).

Our role in reviewing the de novo proceeding is "limited." Phillips, 117 N.J. at 579. We "must ensure there is 'a residuum of legal and competent evidence in the record to support'" the court's decision. Ruroede, 214 N.J. at

4

359 (citation omitted). We do not make new factual findings, but merely "decide whether there was adequate evidence before the . . . [c]ourt to justify its finding of guilt." Phillips, 117 N.J. at 579 (citation omitted). "[U]nless the appellate tribunal finds that the decision below was 'arbitrary, capricious[,] unreasonable[,]' or '[un]supported by substantial credible evidence in the record as a whole,' the de novo findings should not be disturbed." Ibid. (fourth alteration in original). On the other hand, we do not defer to the trial court's legal conclusions. Cosme v. Borough of E. Newark Twp. Comm., 304 N.J. Super. 191, 203 (1997) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

## II.

We derive the following relevant facts and procedural history from the record.

### A. Info-Cop Software

The Department's police cars contain Mobile Data Terminals (MDTs) that run a software called "Info-Cop." Through Info-Cop, officers can access the New Jersey Criminal Justice Information System (NJCJIS), a shared computer database containing records from various agencies, including those maintained

by the New Jersey Motor Vehicle Commission. The Department requires officers abide by the NJCJIS Security Policy in using the MDTs.

Officers can enter a license plate number into Info-Cop and run either a "random" or "full disclosure" inquiry. A random plate inquiry only discloses the vehicle's make, model, color, year, and registration status, whereas a full disclosure plate inquiry reveals personal information about the vehicle's registered owner, including his or her name, date of birth, social security number, address and identifying characteristics such as height, weight, and eye color.

According to the NJCJIS Security Policy, officers can make random plate inquiries without articulable suspicion, while full disclosure inquiries are only permissible if the officer operating the MDT "has articulable cause to stop the vehicle, or otherwise requires full vehicle and owner personal information . . . ." Per Department policy, other situations justifying officer access to full vehicle and owner information include when the vehicle is involved in a collision, the officer is performing a security check on a business or residence, or a random inquiry reveals an expired registration.

The NJCJIS Security Policy is consistent with the decision of our Supreme Court in State v. Donis, 157 N.J. 44 (1998). In that case, the Court directed state

6

law enforcement agencies to reprogram the MDTs' data displays so that "police officers who were using MDTs at random and who lacked suspicion could access only nonprivate information[,]" while those with proper justification could access "the 'personal information' of the registered owner, including name, address, social security number, and if available, criminal record." Id. at 55-56.

Consistent with Donis, the NJCJIS Security Policy explicitly states:

> ANY PERSON WHO FAILS TO COMPLY WITH THIS INSTRUCTION IS IN VIOLATION OF A NEW JERSEY SUPREME COURT DECISION. VIOLATORS SHALL BE SUBJECT TO THE PENALTIES DEEMED APPROPRIATE PURSUANT TO STANDARDS OF DISCIPLINE SET FORTH BY THEIR RESPECTIVE CRIMINAL JUSTICE AGENCY . . . AND/OR CRIMINAL AND CIVIL LIABILITY.

The Department's vehicles are also equipped with recording equipment for use during motor vehicle stops. This recording system includes a front camera mounted under the rearview mirror. This camera is continually recording, but the officer must engage the recording system in order for the camera's footage to be included in the saved video associated with the motor vehicle stop. The recording system engages when the officer activates the vehicle's lights or manually pushes a record button. When engaged, the

recording associated with the stop automatically includes the footage captured thirty seconds before the officer engaged the system.

## B. Plaintiff's Misuse of Info-Cop Software

After attending Essex County Police Academy, plaintiff was sworn in as a police officer in October 2008. He then worked as a police officer for the Palisades Interstate Parkway Police (PIPP) for approximately three and a half years. Plaintiff was trained on how to utilize NJCJIS while at the academy, and he testified "[t]here probably was a class" on NJCJIS when he was first hired by PIPP. On February 1, 2012, the Department hired plaintiff as a police officer. Plaintiff completed an NJCJIS recertification course on November 7, 2013. He remained employed with the Department until his termination.

Captain Christopher DePuyt, a superior to plaintiff within the Department, held the position of Operations Commander and Public Information Officer. "In the course of [his] responsibilities[,]" Captain DePuyt "review[ed] motor vehicle stops made by officers" by viewing "the video produced by the in-car cameras of the officers."

On or about November 22, 2015, while reviewing video footage of a motor vehicle stop conducted by plaintiff, Captain DePuyt "observed some

8

discrepancies as far as what was written in a report submitted for review, as opposed to what was seen on the video."  This stop occurred on November 20, 2015, at approximately 12:45 a.m.  In his investigation report, plaintiff stated he observed the subject vehicle drift across lanes from an approximate distance of ten car lengths.  However, according to Captain DePuyt, the video footage of this stop showed the subject vehicle was not ten car lengths away from plaintiff, but rather there was a distance of "several hundred yards" between plaintiff's vehicle and the subject vehicle.  Additionally, Captain DePuyt concluded "[t]here was no way to see any weaving of the vehicle in question . . . ."

Captain DePuyt's detection of these discrepancies caused him to further scrutinize plaintiff's patrol on November 20.  He looked up plaintiff's Info-Cop license plate inquiries and discovered that plaintiff had conducted only full disclosure plate inquiries during his shift.  Captain DePuyt then checked plaintiff's plate inquiries for the previous four weeks and found all of plaintiff's plate searches during that period were full disclosure inquiries; plaintiff had conducted no random inquiries.

His suspicions raised, Captain DePuyt asked plaintiff to meet with him for "an informal inquiry" into the discrepancies; on November 22 or 23, 2015, they met in Captain DePuyt's office.  There, Captain DePuyt asked plaintiff if he

understood the difference between random and full disclosure lookups, and plaintiff explained the distinction accurately. According to Captain DePuyt, when he asked plaintiff to estimate the percentage of his plate inquiries that were random versus full disclosure, plaintiff answered, "about [fifty] percent." Captain DePuyt further recounted that when confronted with the records indicating he had not performed a single random plate inquiry during the preceding four weeks, contrary to New Jersey law, NJCJIS policy, and his training, plaintiff admitted, "I know I was wrong." Regarding his investigation report's description of the distance between his vehicle and the subject vehicle, Captain DePuyt reported plaintiff said, "I shouldn't have written that."

On November 23, 2015, Captain DePuyt formally referred his concerns about plaintiff to the head of the Department's Internal Affairs (IA), Lieutenant Michael Fairweather, requesting an IA investigation. In full, Captain DePuyt's referral letter provided:

> Please allow this letter to serve as my request for you to investigate [plaintiff]'s use of the full disclosure plate inquiry function of the MDT system. After reviewing four weeks of license plate lookups, I discovered that [plaintiff] had not made one random plate inquiry. All of his lookups were utilizing the full disclosure feature.
>
> This morning I met with [plaintiff][,] who stated he knew the circumstances when the full disclosure

information could be requested. He estimated he used the random plate inquiry function approximately [fifty percent] of the time. I advised that in the aforementioned one[-]month period, he had not made one single random plate inquiry. He offered no explanation and admitted several times that he has been willfully misusing the full disclosure feature and that it was wrong. Please look into this matter at your earliest convenience.

## C. IA Investigation

Lieutenant Fairweather's IA investigation of plaintiff commenced on November 23, 2015, and plaintiff received written and verbal notification of the investigation on that date. As detailed in Lieutenant Fairweather's investigation report, he and Captain DePuyt "accessed the Info-Cop System" and found that from January 1, 2015 to November 23, 2015, plaintiff conducted 5,365 license plate inquiries, yet only nineteen of those searches utilized the random inquiry feature. And though he performed 5,616 full disclosure inquiries, plaintiff only made 705 motor vehicle stops and issued 603 motor vehicle summonses during this eleven-month period.

Lieutenant Fairweather compared plaintiff's random plate inquiry rate to four other officers with a similar number of total license plate inquiries and found that 0.35% of plaintiff's plate searches were random inquiries, while, on average, 77.57% of the other officers' plate searches were random inquiries.

11

Further, the percentage of plaintiff's plate inquiries that were random decreased each year from when he was hired by the Department: "2012- 51.7%, 2013 – 24.0%, 2014 – 1.8%, and 2015 – 0.35%." For each of these four years, random inquiries made up over seventy-one percent of the Department's total license plate inquiries.

Based on these figures, in December 2015, Lieutenant Fairweather requested the Professional Standards Unit of the Mercer County Prosecutor's Office (MCPO) review plaintiff's case "for any possible criminal violations" as well as potential racial bias. The IA investigation was suspended in the meantime. On March 17, 2017, the MCPO found "there was insufficient evidence to warrant a criminal prosecution,"[1] and referred the matter back to the Department for continuation of its administrative investigation.

Lieutenant Fairweather resumed investigating whether plaintiff violated the following Department rules and regulations:

1. Rule 3:1.1 - <u>Performance of Duty</u>

   > All employees shall promptly perform their duties as required or directed by law, rules and regulations, policies and procedures or written directive, or by lawful order of a superior officer.

---

[1] Lieutenant Fairweather's IA report also notes the MCPO investigation revealed plaintiff's "motor vehicle stops appear to be consistent with the demographics of [the] Township and the surround [sic] communities."

A-3400-18

2. Rule 3:4.3 - <u>Reports</u>

No employee shall knowingly falsify an official report or enter or cause to be entered any inaccurate, false, or improper information on records of the department.

3. Rule 3:7.5 - <u>Work Expectation</u>

Employees are expected to perform their duties to the best of their abilities at all times.

On May 26, 2017, Lieutenant Fairweather interviewed plaintiff, who was accompanied by his attorney. Before questioning began, plaintiff was advised of the potential violations of Department rules by him that were under investigation.

Captain DePuyt also attended the interview. Plaintiff's attorney objected to his presence, contending the New Jersey Attorney General's internal affairs guidelines for State law enforcement agencies (AG guidelines) require investigators be unbiased and objective, yet Captain DePuyt was the complainant and a fact witness against plaintiff. Captain DePuyt remained present at the interview and asked plaintiff multiple questions.

According to Lieutenant Fairweather's investigation report, during this interview, plaintiff explained a random plate inquiry is "utilized to get information about the vehicle if you do not have the vehicle committing a

13

violation[,]" while a full disclosure inquiry "would be used when an Officer has a violation on a vehicle such as speeding, backing up another Officer on a stop or a motor vehicle accident." When asked about the statistical disparity between his random inquiries and the rest of the department, plaintiff explained he was trained "to not just sit on the side of the road and run plates"; rather, he waits until he sees a motor vehicle violation and then runs a full disclosure inquiry. Plaintiff claimed he observed motor vehicle violations before all 5,346 of the full disclosure inquiries he conducted in 2015. When reminded that he only performed approximately 700 motor vehicle stops and questioned as to why he did not take enforcement action on the remaining, approximately 4,600, other vehicles that he observed in violation that led him to utilizing the full disclosure inquiry, plaintiff stated there were other full disclosure inquires that may have resulted from him inquiring on other officer's stops, gaining information for motor vehicle accidents, or conducting plate inquiries during business checks. Plaintiff could not explain why his percentage of random inquiries declined each year since 2012 or why his random plate inquiry percentage was markedly lower than the rest of the Department.

Lieutenant Fairweather questioned plaintiff about the November 20, 2015 motor vehicle stop that sparked the IA investigation. According to Lieutenant

Fairweather's report, plaintiff claimed he hit record on the in-car camera system after observing the subject vehicle commit a motor vehicle violation, and that "he does not know why" the violation was not visible on the video recording. He stated he would not have hit record or pulled over the vehicle if he did not witness a violation. He also said he recalled the subject vehicle being ten car lengths ahead of his, "but it could have been [twenty] or [thirty]." Plaintiff "stated he considers a car length to be [twenty]-[thirty] feet, possibly [forty] feet . . . ." Plaintiff posited that he did not think he told Captain DePuyt during their November 2015 meeting that he willfully violated the NJCJIS policy. When asked by Lieutenant Fairweather during this interview if he believed he violated the policy, plaintiff "answered no."

Lieutenant Fairweather also questioned plaintiff about a motor vehicle stop plaintiff conducted on May 15, 2015, which led to the arrest of the driver.[2] In plaintiff's investigation report, he stated he pulled the vehicle over after "perform[ing] a random registration check" that indicated the vehicle's registration was expired; however, the investigation into plaintiff's license plate

---

[2] Before being questioned about both this motor vehicle stop and the one that occurred on November 20, 2015, plaintiff was afforded the opportunity to review, in private with his attorney, the video footage of and his reports on the motor vehicle stops.

inquiries revealed he performed a full disclosure inquiry. It also revealed plaintiff had performed twenty-three full disclosure inquiries on other license plates before the subject vehicle on that date. Asked to explain why his investigation report provided he performed a random inquiry, rather than a full disclosure inquiry, plaintiff "stated that he did not know but that the vehicle may have had a violation out of view" or perhaps in another town, which he would not include in his report. He also stated he possibly was looking at another officer's report when he wrote that his inquiry was random.

Following his investigation, Lieutenant Fairweather issued a ten-page IA Report setting forth his findings regarding the allegations against plaintiff. Lieutenant Fairweather "sustained" and "substantiated" plaintiff's violations of the three Department rules. On June 1, 2017, the Department's police chief, Brian C. Spring, advised plaintiff in writing that he was being placed on paid administrative leave pending review of the IA report and recommended charges. On July 6, 2017, Captain DePuyt served plaintiff with a Notice of Disciplinary Action (NDA), suspending plaintiff without pay and recommending plaintiff's removal. The NDA listed the following charges with accompanying specifications:

Rule 3:1.1 – Performance of Duty

Did willfully and intentionally engage in ongoing repeated course of improper and unlawful conduct of violating the NJCJIS Policy by conducting full information inquiries on the in-car computer without the required supported justification or factual basis.

Did willfully and intentionally engage in an ongoing, repeated course of improper and unlawful conduct of violating the New Jersey Statutes, and violating the statutory privacy rights of citizens, by conducting full information inquiries on the in-car computer without the required supported justification or factual basis.


Rule 3:4.3 – Knowingly Falsifying Official Reports

Did willfully state false information in reports as specified: May 15, 2015 . . . (Misstatement of conducting a random plate inquiry, when no such inquiry was performed and omitting the probable cause for the traffic stop.)[,] November 20, 2015 . . . (Misstatement of distance and location of suspect vehicle.)


Rule 3:7.5 – Work Expectation; employees are expected to perform their duties to the best of their abilities at all times

Did willfully fail to document proper information in reports as required . . . .

Misconduct as defined in N.J.S.A. 40A:14-147[,] Incapacity as defined in N.J.S.A. 40A:14-147

17

Did engage in a course of conduct, as more fully described in the foregoing specifications, involving conduct equivalent to the crime of pattern of official misconduct, N.J.S.A. 2C:30-7, involving dishonesty and moral turpitude.

D.  Testimonial Hearing

A testimonial hearing was conducted before a Township hearing officer over the course of three days, October 10, 2017, November 7, 2017, and February 20, 2018.  Lieutenant Fairweather, Captain DePuyt, Chief Spring, Lieutenant Daniel Comune, and plaintiff testified.  Lieutenant Fairweather testified about the IA investigation of plaintiff.  The recording of plaintiff's IA interview with Lieutenant Fairweather was played in full while Lieutenant Fairweather was on the stand.

Captain DePuyt recounted his discovery of plaintiff's alleged misconduct, his November 2015 meeting with plaintiff, and his limited role in assisting Lieutenant Fairweather's investigation.  Captain DePuyt testified that in his twenty-four years on the force, plaintiff's misuse of the plate inquiry system was "one of, if not the most serious issues that [he] had to entertain as an administrator and police officer."  He added plaintiff's conduct was "extremely serious" and he "was shocked by it."

Chief Spring testified as to various Department policies and stated it was his decision to seek plaintiff's termination. He explained he sought that penalty because plaintiff's conduct involved "an integrity issue and a public trust issue[,]" and he "believe[d] that there were some false statements made . . . ." Thus, plaintiff "would have a tough time participating in arrests or court testimony" because of his dishonesty, which would present "a very great burden on the Department to keep that officer . . . ."

Lieutenant Comune was one of plaintiff's supervisors who maintained personnel files and early warning records. He explained the Department's early warning system documents potential issues involving officers "to give the Department early warning that there might be a problem with a particular officer" and "if we do see an officer having many entries, it can go to an IA complaint based on that." Lieutenant Comune reviewed and discussed three incidents involving plaintiff contained in his personnel file: one where plaintiff forcefully searched a passenger who explicitly denied plaintiff's request for consent to search, another where plaintiff obtained consent to search an individual but failed to inform the individual that he could refuse consent, and one noting that plaintiff "was disciplined for demeanor and his use of foul language."

19

Through his testimony, plaintiff attempted to explain his high percentage of full disclosure inquiries. He testified that he generally does not run random searches because "[t]he license plate does nothing for me[,]" whereas his observations of a driver's body language and whether "the vehicle is safe for the roadway" is more useful. He also argued the total number of full disclosure inquiries uncovered in the IA investigation was overstated because there were duplicate lookups, out-of-state plate inquiries, and those conducted with the requisite cause.

Plaintiff acknowledged he incorrectly wrote he performed a "random" registration check in his May 15, 2015 investigation report and acknowledged he previously stated, "that maybe I was referring back to somebody else's report," but ultimately concluded he had no explanation for why he wrote "random" instead of "full disclosure." Nevertheless, plaintiff asserted the full disclosure inquiry was appropriate because he witnessed a traffic violation in another town beforehand, though he could not remember what violation occurred. He explained he neglected to note this traffic violation in his report because supervisors instructed him not "to list anything . . . in your report that happened out of town[,]" though he also stated that was "not what [he] was taught" and "it was a mistake."

Regarding the difference between the distance described in his November 20, 2015 investigation report and that depicted on the video of the traffic stop, plaintiff explained he "didn't review the video prior to writing the report" and wrote his report based on what he viewed "with [his] eyes." He suggested there may have been "an issue with the depth perception . . . or as you could see, it was a dark night" and "all you could see was lights." Plaintiff further claimed he activated his vehicle's recording system "[s]imultaneously" with his observation of the motor vehicle violation. Though his superiors stated the video did not show the subject vehicle drift across the lane, plaintiff argued:

> You could see taillights when my vehicle is passing Leslie Pools, you could see the taillights at the left side of the center lane, but can you see tires going over into the left-hand, into the left-hand lane? No. Can you see the vehicle move over a little bit? You can see the lights move over a little bit. I could see it.

On May 7, 2018, the hearing officer rendered a twenty-six-page written "report of findings and determinations" wherein he determined plaintiff violated Department Rules 3:1.1 – Performance of Duty and 3:4.3 – Reports and engaged in misconduct and incapacity under N.J.S.A. 40A:14-147. The hearing officer found plaintiff did not violate Rule 3:7.5 – Work Expectation.

Employing the concept of "progressive discipline" to consider plaintiff's "history, not only as an extremely productive . . . proactive and zealous Officer,

21

but also his failure to respect the rights of our citizens and extend the appropriate courtesies to them[,]" the hearing officer ultimately recommended the Township terminate plaintiff's employment. He cited plaintiff's "disregard of the citizens' right to be free of unreasonable searches and seizures[,]" which was "reflected not only in the universal use of full disclosure lookups, but also in his interaction with motorists where, in two document[ed] occasions, he engaged in inappropriate searches." The Township accepted the hearing officer's findings and conclusions on May 18, 2018, and terminated plaintiff's employment, effective that date.

## E. Trial Court Proceedings

On May 24, 2018, plaintiff filed a complaint in lieu of prerogative writ for de novo review of the Township's May 18, 2018 disciplinary decision, pursuant to N.J.S.A. 40A:14-150. The trial court held a trial de novo on January 9, 2019.

On February 25, 2019, the trial court entered an order affirming plaintiff's termination and issued an accompanying written opinion in support of the order. The trial court found "[p]laintiff failed to perform his duties required by law in violation of Rule 3:1.1" because he was "unable to explain or demonstrate the proper justification" for using "the MDT to conduct full disclosure inquiries well

over 2,000 times" and "he acknowledged that he knew the restrictions the Department established for officers, but did not follow those restrictions."

The trial court further determined the inaccuracies in plaintiff's investigation reports for the May 15, 2015 and November 20, 2015 motor vehicle stops amounted to a violation of Rule 3:4.3. Regarding the May 15 report, the court found plaintiff "knowingly entered false information" by writing that he performed a random registration check rather than a full disclosure inquiry, as his "varying explanations for his report and the circumstances surrounding the stop render his testimony evasive and incredible." Additionally, the court found plaintiff's admission to Captain DePuyt that he should not have misdescribed the distance between his car and the subject vehicle, his inability to explain why no motor vehicle infraction was viewable on video, and his changing explanation for the report's inaccuracies showed he "deliberately entered false information" in his November 22 report. Indeed, the court found plaintiff's "varying, and nearly inconceivable explanations[ were] indicative of deliberate misrepresentation to evade accountability."

The trial court found plaintiff "engage[d] in conduct that constitutes misconduct and incapacity" by

23

repeatedly, and for extended amount of time, exclusively us[ing] full disclosure inquiries in his regular policing practices in knowing violation of the restrictions placed on officers by the Department, thereby invading the privacy of thousands of citizens. He also deliberately made knowing misrepresentations to investigating superior officers when questioned about his practice in order to evade accountability, and in one instance appears to have created a pretense to justify a motor vehicle stop.

In addition, plaintiff "demonstrated that he is incapable of properly recording events." This conduct raised serious questions as to plaintiff's "veracity and judgment" and showed he failed to "maintain[ ] the high standard of care that has been placed upon him."

Finally, the trial court stated that "[t]he totality of the record demonstrates that the penalty of removal is warranted." While plaintiff was never suspended previously, the court noted plaintiff had six entries in his early warning record, more than almost all other Department officers, with some involving illegal searches. The court concluded,

The instant misconduct involving the inappropriate invasion of privacy of thousands of citizens over a period of years, deliberate falsification of police reports, and material misrepresentations made to superior officers and IA alone, warrant removal. These serious acts call into question [p]laintiff's veracity and judgment, the core principals of public service.

24

Further, [p]laintiff has never held himself accountable, and only sought to evade providing conclusive answers.

This appeal followed, with plaintiff presenting the following points of argument:

POINT I

THE TRIAL COURT ERRED IN REFUSING TO DISMISS THE CHARGES AS A VIOLATION OF LEVINE'S RIGHTS UNDER WEINGARTEN AND THE AG GUIDELINES

    A. DePuyt's November 22, 2015 Interview Violated Levine's Rights Under Weingarten and the AG Guidelines[.]

    B. DePuyt's Involvement in Levine's May 26, 2017 Interview Violated the AG Guidelines[.]

    C. The Charges Against Levine Must be Dismissed[.]

POINT II

STANDARD OF REVIEW FOR APPEAL OF A DE NOVO PROCEEDING

POINT III

THE TRIAL COURT ERRED IN FINDING THE TOWNSHIP PROVED THE CHARGE OF PERFORMANCE OF DUTY

    A. The NJCJIS Policy Does not Prohibit Exclusive use of Full Disclosure Inquiries nor Does it Prescribe a Certain Ratio[.]

B. The Trial Court Erred in Assuming Without Evidence that Levine Conducted Unjustified Full Disclosure Inquiries[.]

C. The Trial Court Improperly Placed the Burden of Proof on Levine and Used the Township's Refusal to Produce Discovery Against him[.]

D. The Trial Court Erred in Relying on Faulty, Irrelevant Comparisons[.]

POINT IV

THE TRIAL COURT ERRED IN FINDING THE TOWNSHIP PROVED THE CHARGE OF KNOWINGLY FALSIFYING OFFICIAL REPORTS

A. The Totality of the Circumstances do not Support that Levine Knowingly Falsified his Reports[.]

B. May 15, 2015 Motor Vehicle Stop[.]

C. November 20, 2015 Motor Vehicle Stop[.]

POINT V

THE TRIAL COURT ERRED IN FINDING THE TOWNSHIP PROVED THE CHARGE OF MISCONDUCT AND INCAPACITY

A. Levine is not Guilty of Misconduct and Incapacity Because he did not Engage in Official Misconduct[.]

A. Levine is not Guilty of Misconduct and Incapacity Because he did not Breach the Public Trust[.]

26

POINT VI

THE TRIAL JUDGE ERRED IN ASSESSING AN
EXCESSIVE PENALTY AGAINST LEVINE

    B. The Seriousness of Levine's Conduct does not
       Warrant Termination[.]

    C. Progressive Discipline does not Warrant a
       Termination[.]

III.

In his brief, plaintiff attacks the Township for basing its "bogus charges

on unsupported assumptions, a specious comparison of [his] statistics[,] and two

clerical errors." He further contends the trial court ignored "crucial facts and

supporting law" in affirming his disciplinary conviction and the imposition of

"an arbitrary punishment" that "shocks the conscience."

We reject these contentions and plaintiff's other claims of trial court error,

in light of the record and applicable legal principles. Pursuant to our "limited"

standard of review, Phillips, 117 N.J. at 579, we affirm substantially for the

reasons expressed in the trial court's comprehensive written decision,

recognizing it "is based on findings of fact which are adequately supported by

the evidence" in the record. R. 2:11-3(e)(1)(A). In doing so, we determine the

court's decision was not arbitrary, capricious, or unreasonable. Phillips, 117 N.J. at 579. We add the following comments.

The record clearly shows, and plaintiff readily admits, that he conducted at least 2,689 full disclosure inquiries unrelated to motor vehicle stops.[3] Plaintiff was unable to provide a credible explanation for these unjustified inquiries or for the significant disparity between plaintiff's use of full disclosure inquiries compared to the Department's other officers. This evidence is sufficient to establish by a preponderance that plaintiff conducted full disclosure inquiries without "articulable cause" numerous, if not thousands of, times.

As noted, the Supreme Court's decision in Donis, the NJCJIS Security Policy, and the Department's internal policies bar officers from conducting full disclosure inquiries absent reasonable suspicion or another justification. The purpose of this rule is to protect the privacy interests of our state's motorists.

_____

[3] Plaintiff provides the calculation for this figure in his brief:

> After deducting duplicate entries, out-of-state plates, inquiries run on individual names which must be full disclosure, blank spaces and Xs (which generate when the system auto-populates for an eTicket), and his 705 motor vehicle stops, [plaintiff] arrived at a total of 2,689 inquiries which were unrelated to motor vehicle violations and arrests.

Plaintiff knew of, received training on, and was able to articulate the rule governing full disclosure inquiries all before the IA investigation against him commenced. Yet he did not follow it.

Department Rule 3:1.1 – Performance of Duty required plaintiff "perform [his] duties as required or directed by law, rule and regulations, policies and procedures or written directive . . . ." By conducting numerous full disclosure inquiries without the requisite suspicion, cause, or justification, plaintiff failed to perform his duties as directed by the Court, the Department, and the NJCJIS Security Policy. Thus, the trial court did not err in finding plaintiff violated Department Rule 3:1.1.

We likewise find the trial court's determination that plaintiff violated Department Rule 3:4.3 – Reports was supported by sufficient credible evidence in the record. Department Rule 3:4.3 required plaintiff refrain from "knowingly falsify[ing] any official report or enter[ing] or caus[ing] to be entered any inaccurate, false, or improper information on records of the department." Plaintiff argues he did not violate this rule because he did not "knowingly" or "intentionally" include false information in either his May 15 or November 20, 2015 reports. This argument lacks merit.

29

Plaintiff's May 15, 2015 report provided he performed a random inquiry, but his plate inquiry history revealed he actually performed a full disclosure inquiry, and the trial court found plaintiff's "varying explanations" for this discrepancy to be "evasive and incredible." Similarly, plaintiff's November 20, 2015 report included details about a motor vehicle violation that should have been observable on the video footage of the stop but were not, and the trial court found plaintiff's "varying, and nearly inconceivable explanations" for these inconsistencies "to be indicative of deliberate misrepresentation to evade accountability." Thus, the record shows plaintiff included inaccurate or false information in the two reports, and his unpersuasive explanations reasonably convinced the trial court that he included the misrepresentations knowingly. Therefore, the trial court did not err in finding plaintiff violated Department Rule 3:4.3.

The evidence in the record showing plaintiff violated the two Department rules also supports the trial court's finding that plaintiff committed misconduct as defined by N.J.S.A. 40A:14-147. Our Supreme Court has "held that a finding of misconduct by a police official need not be predicated on the violation of any particular department rule or regulation[,]" and may be based merely upon a deviation from the "implicit standard of good behavior which devolves upon one

who stands in the public eye as the upholder of that which is morally and legally correct." Phillips, 117 N.J. at 576 (citation omitted). "[T]he qualifications required to hold [a law enforcement] position require a high level of honesty, integrity, sensitivity, and fairness in dealing with members of the public, knowledge of the law, and a pattern and exhibition of law-abiding conduct." Gismondi, 353 N.J. Super. at 185. Because "honesty, integrity, and truthfulness [are] essential traits for a law enforcement officer[,]" the Court has upheld termination for misconduct where, for example, an officer made conflicting statements to internal affairs investigators about an off-duty altercation. Ruroede, 214 N.J. at 362-63.

There is significant evidence in the record demonstrating plaintiff engaged in misconduct unbecoming of a police officer. Plaintiff showed a lack of honesty, integrity, and truthfulness by knowingly including false information in at least two police reports and by actively failing to take responsibility for doing so. Worse, plaintiff failed to exhibit law-abiding conduct or fairness to members of the public by bypassing Department policy and a Supreme Court directive to conduct unjustified full disclosure inquiries that invaded the privacy rights of potentially more than two thousand New Jersey motorists. Therefore, the trial

31

court did not err in finding plaintiff engaged in misconduct under N.J.S.A. 40A:14-147.

IV.

Plaintiff's "misconduct" and "disobedience of [Department] rules and regulations" constituted just cause for the Township to discipline plaintiff. Plaintiff, however, argues the termination of his employment constituted an excessive penalty, as neither the seriousness of his conduct nor the doctrine of progressive discipline warranted termination. In turn, he argues the trial court should have modified plaintiff's termination to instead impose a more lenient disciplinary measure.

The concept of "progressive discipline" was developed "to promote proportionality and uniformity in the rendering of discipline of public employees." In re Stallworth, 208 N.J. 182, 195 (2011). Public entities employ the doctrine "(1) to 'ratchet-up' or 'support imposition of a more severe penalty for a public employee who engages in habitual misconduct;' and (2) 'to mitigate the penalty' for an employee who has a record largely unblemished by significant disciplinary infractions." Id. at 196 (quoting In re Herrmann, 192 N.J. 19, 30-33 (2006)).

A-3400-18

When considering the penalty the municipality imposed upon an officer on de novo review, the trial court asks "whether such punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness." In re Carter, 191 N.J. 474, 484 (2007); Herrmann, 192 N.J. at 28-29. The trial court may modify, but not increase or enhance the penalty. Cosme, 304 N.J. Super. at 201-02.

In reviewing the trial court's de novo findings, appellate courts will uphold "dismissal of employees, without regard to whether the employees have had substantial past disciplinary records, for engaging in conduct that is unbecoming to the position." Herrmann, 192 N.J. at 34. In that regard, our Supreme Court has explained:

> [P]rogressive discipline is not "a fixed and immutable rule to be followed without question" because "some disciplinary infractions are so serious that removal is appropriate notwithstanding a largely unblemished prior record." "Thus, progressive discipline has been bypassed when an employee engages in severe misconduct, especially when the employee's position involves public safety and the misconduct causes risk of harm to persons or property."
>
> [Stallworth, 208 N.J. at 196-97 (citations omitted) (first quoting Carter, 191 N.J. at 484; then quoting Herrmann, 192 N.J. at 33).]

We agree with the trial court here that plaintiff's misconduct was sufficiently egregious and unbecoming to his office to warrant removal, even without considering plaintiff's early warning record. Plaintiff violated Department policy to invade the privacy of potentially thousands of New Jersey motorists. His early warning record, which further reveals plaintiff's tendency to conduct unlawful searches, only confirms the appropriateness of the penalty imposed. Consequently, the determination that plaintiff's removal was justified is supported by substantial, credible evidence in the record and was not arbitrary, capricious, or unreasonable.

V.

Plaintiff further contends his rights under Weingarten[4] and the AG guidelines were violated because he did not have representation at the initial November 2015 meeting with Captain DePuyt and Captain DePuyt participated in the May 26, 2017 IA interview. Because these violations "impermissibly and irrevocably tainted the entire investigatory and disciplinary process," plaintiff argues his termination should be reversed and the charges against him dismissed.

---

[4] N.L.R.B. v. J. Weingarten, Inc. 420 U.S. 251, 260 (1975).

In Weingarten, the United States Supreme Court held that, pursuant to the National Labor Relations Act (NLRA), a union member is entitled to representation at an interview by management "only in situations where the employee requests representation" and "where the employee reasonably believe[s] the investigation will result in disciplinary action." 420 U.S. at 257. The NLRA does not apply to public employees in New Jersey, but N.J.S.A. 34:13A-5.4(a)(1) has been interpreted to provide public employees the same right, which if violated will constitute an unfair labor practice. Hernandez v. Overlook Hosp., 149 N.J. 68, 75 (1997); In re Univ. of Med. & Dentistry of N.J., 144 N.J. 511, 527 (1996).

Citing Weingarten, the AG guidelines provide the right to representation attaches when he "requests representation and reasonably believes the interview may result in disciplinary action." New Jersey Attorney General, Internal Affairs Policy & Procedures 51 (Dec. 2019)[5] (citing Weingarten, 420 U.S. at 251). See also Univ. of Med. & Dentistry, 144 N.J. at 530. The guidelines further require an officer be advised prior to the start of questioning when he is the subject of an investigation and emphasize, "Investigators must strive to

_____

[5] Available at: https://www.nj.gov/oag/dcj/agguide/directives/2019-Internal_Affairs_Policy_and_Procedures.pdf

A-3400-18

conduct a thorough and objective investigation without violating the rights of the subject officer or any other law enforcement officer." Id. at 28, 50.

The trial court, in a footnote, rejected plaintiff's claim that his Weingarten rights were violated because he lacked representation during the initial November 2015 meeting with Captain DePuyt. First, the trial court noted plaintiff first raised this issue during oral argument, and not before the hearing officer or in written brief. Rejecting the claim on its merits, the court found:

> Captain DePuyt credibly testified without contradiction that the purpose of the meeting was "an informal inquiry" related to the discrepancies in the motor vehicle stop and corresponding report as well as the use of random inquiries. . . . There was no decision to conduct an investigation or impose discipline prior to this meeting.

The court also cited Captain DePuyt's testimony indicating the purpose of the meeting was to find out if he would pursue disciplinary measures. Based on this evidence, the court concluded, "there would be no reason for . . . [p]laintiff to believe he would be subject to discipline" and thus, "there was no Weingarten violation."

We agree with the trial court's analysis here and add only that per Weingarten and the AG guidelines, an officer is only entitled to the benefit of

36

counsel when he requests representation. Plaintiff made no such request before the initial meeting with Captain DePuyt.

We also find no merit in plaintiff's contention that Captain DePuyt's participation in the May 26, 2017 interview violated the AG guidelines requiring IA investigations be conducted by objective investigators. Captain DePuyt testified that his only role in IA investigation was gathering data for Fairweather, reducing his recollections to writing, attending the IA interview, and attending a meeting where Fairweather referred the case to the MCPO. Fairweather otherwise conducted the investigation independently from Captain DePuyt. Both witnesses were deemed credible. Additionally, we fail to understand how Captain DePuyt's presence at the IA interview prejudiced plaintiff when he would have been questioned about his previous statements to DePuyt regardless of whether DePuyt attended the interview.

Before his termination, plaintiff was afforded an IA interview with Weingarten representation and a multi-day hearing before an appointed hearing officer. The Township's decision was then reviewed by the trial court and now by this court. We are satisfied that the charges against plaintiff and his termination received a thorough, objective review.

Any arguments not specifically addressed lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3400-18